Lowell W. Finson
CA Bar# 275586, AZ Bar# 10872
**FINSON LAW FIRM LLC.**
118 Channel Pointe Mall
Marina Del Rey, CA 90292
Telephone: (602) 377-2903
Facsimile:  (310) 425-3278
lowell@finsonlawfirm.com
Attorneys for Plaintiff
ARIEL COHEN, D.O.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE STATE OF ARIZONA

| | |
|---|---|
| ARIEL COHEN, D.O., an individual | Civil Action No. |
| Plaintiff, | COMPLAINT FOR DAMAGES |
| | JURY TRIAL DEMANDED |
| v. | |
| ENVISION PHYSICIAN SERVICES OF ARIZONA LLC, a corporation, PATRICK NICHOLS, D.O. an individual, and JOHN DOES 1-10 | |
| Defendants . | |

Plaintiff ARIEL COHEN (herein as "COHEN" or "Plaintiff), by and through

her attorneys, Lowell W. Finson, of the Finson Law Firm, for her Complaint against

Defendants , Envision Physician Services of Arizona LLC, a corporation,  (herein

"Defendant EPS" or "EPS"), Patrick Nichols, D.O., is an individual physician (herein

"Defendant Nichols") and John Does 1-10 (hereinafter referred to collectively as

"Defendants") aver as follows:

**COMPLAINT FOR DAMAGES**
1

## NATURE OF THE CASE

1.       Defendants  wrongfully terminated Plaintiff, as well as subjected her to discrimination based upon sex, age and disability,  and harassed and retaliated against Plaintiff, and the actions created a hostile work environment, all of which occurred in Yuma County, Arizona.

## PARTIES

2.      Plaintiff was, at all relevant times, an individual citizen and resident of San Diego, California  and was a female employee of Defendants , and was treated as if she had a disability, i.e., autism or personality disorder,  and as a direct result of these classifications, was the victim of discrimination, retaliation and harassment, which created a hostile work environment.

3.      Defendant is an out of state business entity, and upon information and belief, has its principal place of business in Phoenix, Arizona, and is a healthcare provider.

4.      Defendant Patrick Nichols D.O. is a licensed osteopathic physician and is an employee of Defendant EPS, and was Plaintiff's immediate supervisor at the Yuma Regional Hospital in Yuma, Arizona.

5.      Plaintiff is informed and believes, and based thereon alleges, that Defendants, DOES 1- 10, and each of them, were, at all times herein mentioned, residents of the State of Arizona  and were managers, officers, supervisors, managing agents and/or employees of Defendant EPS  and each of them, having the actual or apparent

authority to participate in or recommend decisions affecting the Plaintiff's job benefits and employment status.

6.      The true names or capacities, whether individual, corporate, associate, or otherwise of Defendants , DOES 1-10, inclusive, are unknown to Plaintiff, and therefore, Plaintiff sues these Defendants by such fictitious names.  Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and based thereon alleges, that each of these fictitiously named Defendants  is responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages, as herein alleged, were proximately caused by their conduct.

7.      Plaintiff is informed and believes, and thereon alleges, that at all times mentioned, each of the Defendants , including the fictitiously named Defendants, were the agents and employees of each of the other Defendants, and in doing the things hereinafter alleged, were acting within the scope and course of such agencies and/or employments.

8.      All the within claims are brought pursuant to the applicable labor and discrimination laws in the State of Arizona, as well as applicable Federal Employment Discrimination laws, related to claims of sex and disability discrimination, as well as harassment and retaliation based upon sex and disability discrimination.

9.      More specifically, the within claims are brought pursuant to the applicable labor and discrimination laws in the State of Arizona, as well as applicable Federal Employment Discrimination laws, related to claims of sex and disability discrimination, as well as harassment and retaliation based upon sex and disability discrimination, namely, The Americans with Disabilities Act and The Arizona Employment Protection Act A.R.S. § 23-1501(AEP),  §A.R.S 41- 1463 (ACRD), 42 U.S.C., Title VII, Sex Discrimination,  and any other specific State or Federal laws which may become relevant as the case progresses.

10.     Any and all acts constituting sex, disability, retaliation and harassment, occurred within 300 days of filing the EEOC charge.

## **JURISDICTION**

11.   At all times mentioned herein, the Parties actions occurred in the State of Arizona.

12.   As this matter has been removed from State Court, based solely upon diversity of citizenship, which is not denied, Plaintiff is asserting any pertinent Federal and State causes of action.

13.   Plaintiff filed a timely EEOC Charge, and was given a right to sue letter, which she received on October 30, 2021. This satisfies any administrative requirement to pursue the within claims.

## **FACTS COMMON TO ALL CAUSES OF ACTION**

14.    Plaintiff, a Doctor of Osteopathic Medicine,  began working for Defendants in Yuma, Arizona as an emergency physician to offer healthcare services to patients at Yuma Regional Hospital in 2019.

15.    At the time of Plaintiff's hire, Defendants Employee Handbook specifically prohibited discrimination based upon disability, e.g., autism is a specified disability, and any resultant retaliation or harassment based thereon.

16.    The Handbook also prohibited any romantic affairs between supervisors and subordinates.

17.     Plaintiff had a long period of satisfactory performance while employed by Defendants .

18.    Defendant Nichols was, at all times pertinent, an employee of Defendant EPS, and was a Doctor of Osteopathic Medicine.

19.    Plaintiff began experiencing discriminatory behavior after Defendant Nichols became Director in August 2020.

20.    All relevant acts constituting discriminatory behavior and resulting harassment and retaliation occurred after Defendant Nichols became Director, in August 2020.

21.    After August 2020, Defendants created a hostile work environment for Plaintiff.

22.    On or about October 30, 2020, Defendants treated Plaintiff as if she had a mental disability, i.e., autism or personality disorder, which she denied ever having

been diagnosed until May 2021, when she notified Defendants, but even so denied having any such disorders which interfered with her ability to do her job.

23.    Plaintiff was informed by a colleague that Defendant Nichols had told others he felt Plaintiff had a mental disability, i.e., autism, and she needed to be terminated as a result of his improper perception.

24.    In October 2020, Plaintiff discovered Defendant Nichols was having an affair with a nurse who he promised favorable employment treatment after she completed her education to become a nurse practitioner, which is specifically prohibited by Defendants' Handbook.

25.    Plaintiff learned this "subordinate affair" issue from several case managers, as well as a flight medic, that Defendant Nichols had engaged in such behavior with others.

26.    Such an affair is strictly prohibited by the Defendants' Employee Handbook, and Plaintiff refused to accept the quid pro quo behavior was acceptable.

27.    Upon information and belief, other female employees who were subject to Defendant Nichols' sexual advances denied them, and were subject to discrimination.

28.    Plaintiff, as a staff physician, was duty bound to report, and did temporally report such sexual quid pro quo actions to her other supervisors and HR personnel, but she received no indication her report was addressed.

29.     Following this report, in November 2020, Defendant Nichols began a pattern of discrimination based upon sex and perceived disability, which continued until Plaintiff was terminated on August 18, 2021, allegedly for having had one patient grievance.

30.     One such incident occurred on April 8, 2021, during a "hand-off" of patient care to Plaintiff, she asked if the patient, a 7-year old who presented with psychotic behavior, needed a certain course of treatment, but before Plaintiff could properly assess the patient, Defendant Nichols cut her off from further inquiry, and publicly accused Plaintiff of indicating the prior physician had given poor care, and did not need to ask any further questions, which intimidated Plaintiff to fear registering further complaints regarding Defendant Nichols' behavior as harmful to the proper care of the patient.

31.     In 2021, Plaintiff complained to Defendant Nichols that other staff physicians were not documenting minor psychiatric patients' care, causing a delay in treatment and/or harm to them.

32.     Defendant Nichols did not respond.

33.     Defendant Nichols repeatedly interfered with Plaintiff's ability to seek background information on other "hand-off" patients.

34.     On another occasion, Defendant Nichols prevented Plaintiff from acquiring the appropriate information, delaying the "hand-off" for 20 minutes after Plaintiff's shift ended.

35.    In further retaliation and harassment, Plaintiff had documented a consultation with a specialist who reported Plaintiff had failed to obtain said consult.

36.    Plaintiff complained to HR of Defendant Nichols' behavior regarding "hand-off" issues, and the discriminatory and retaliatory behavior worsened.

37.    On June 25, 2021, Defendant Nichols  emailed Plaintiff accusing her of failing to follow "Quality Review" procedures, despite her being Quality Review Director, and Plaintiff responded indicating he was mistaken, and offered examples of her proper implementation of said procedure.

38.    Within a day, Plaintiff's other supervisor, Dr. Kole (Defendant Nichols' boss), who was not on the email string, called her and stated that she was being "disrespectful" of Defendant Nichols, and she could be terminated for such behavior.

39.    Plaintiff was told by others in her group that Defendant Nichols had circulated a rumor that Plaintiff was autistic.

40.    Thereafter, Defendant Nichols indicated that all members of Plaintiff's physician group were going to have their hours cut, due to Covid, but he would offer more hours to any member who expressed an interest, but when Plaintiff expressed an interest, she was not offered more hours.

41.    Thereafter, Plaintiff had a minor back injury and was using a heating pad to ease the pain, and Defendant Nichols told Plaintiff's colleagues that Plaintiff was

probably using the heating pad to hide drugs, which was false and caused her further humiliation.

42.    One of Plaintiff's roles was to observe quality control, Defendant Nichols was a constant offender of these policies, as he would never respond to staff issues, and such failure was reported as she was required to do.

43.    It was common knowledge that Defendant Nichols had a drug and/or alcohol problem, but rather than further drawing his ire, Plaintiff asked a friend to intervene to address his problem.

44.    Soon thereafter, Defendant Nichols accused Plaintiff of using drugs, which was false and malicious.

45.    Defendant Nichols repeatedly complained to Plaintiff's colleagues that she was being rude when she questioned patient safety issues, which was untrue.

46.    At all times pertinent,  Defendant Nichols banned Plaintiff from working with residents, as he felt this was unnecessary, despite the fact that good practice is to have residents assist in treatment and learn from experienced physicians.

47.    More particularly, Defendant Nichols repeatedly demeaned Plaintiff by condemning her scrupulous attention to safety, e.g. , refusing to address Plaintiff's ongoing concerns with patient's documentation, staff being lax in safety procedures, failing to properly document procedures, failing to protect staff when signing out

during shift changes, and in other ways failing to act to recognize the general patient and staff problems.

48.     On or about April 12, 2021, Plaintiff was placed on a Performance Improvement Plan (PIP), allegedly for being rude to staff and patients.

49.     While this was untrue, Plaintiff accepted "constructive criticism" could certainly improve her performance in the eyes of her supervisors, patients and especially Defendant Nichols.

50.     During the PIP, Plaintiff was advised by the Director of Nursing that she was showing great improvement, and would likely be off the PIP according to its terms, 90 days, and was, in fact, improving in all issues raised in the PIP.

51.     Upon information and belief, Defendant Nichols received the second highest number of patient complaints, but underwent no PIP.

52.     Many others received far more patient complaints, but upon information and belief, none were subject to a PIP.

53.     One of the elements of the PIP was for Defendant Nichols to assess Plaintiff's success and to meet with her to aid in any alleged deficiencies, which never occurred.

54.     The PIP also called for Plaintiff to reach out to other Defendants' agents, but her requests for such meetings was repeatedly ignored.

55.   While Plaintiff was still on her PIP, she was called by Karen Mercer, Defendants' HR representative to discuss Plaintiff's numerous complaints regarding Defendant Nichols' behavior.

56.   At that meeting, Plaintiff supported her complaints with the names of victims of sexual harassment, other staff members who slept with Defendant Nichols, case managers who indicated Defendant Nichols had committed HIPAA violations, and that she had received her PIP by email.

57.   Mercer indicated it was against protocol to send a PIP by email.

58.   Mercer indicated she would investigate these accusations, and would demand meetings be set by those who had previously refused to adhere to the PIP.

59.   On May 20, 2021, Plaintiff had her first meeting, and in a very demeaning fashion, she was told she was lacking in communication skills, case reviews and had other problems, all of which she had never been previously coached on, nor been given a chance to challenge.

60.   At the meeting, Plaintiff understood that Defendant Nichols and his boss, Dr. Kole, would attend, and she was told they refused to attend, but that Defendant Nichols would meet with her to discuss her progress.

61.   After the meeting, Plaintiff emailed Defendant Nichols to set up meetings regarding the PIP.

62.     Following the meeting, Plaintiff was told to reach out to several supervisors, including Defendant Nichols, but all refused to meet with her.

63.     Despite numerous efforts to meet with her supervisors, she received no responses until July 5, 2021, but Dr. Kole indicated Plaintiff was not going to survive the PIP as she was being disrespectful, and that is a terminable offense.

64.     On July 8, 2021, Plaintiff had a staff  meeting, where she was told that Defendant Nichols had interfered with another physician's patient, who complained he was rude, and the physician told Defendant Nichols to stay away from her patients, and he laughed at her.

65.     On or about  August 18, 2021,  Plaintiff was terminated based upon the false accusation that she had been derelict in her duties, but more specifically that she had one patient grievance.

66.     Plaintiff repeatedly complained to Defendants that she was subject to discrimination, but nothing was done to alleviate the situation.

67.     Plaintiff suffered severe emotional distress, while Defendants continued a pattern of warnings, discipline and pressure, causing Plaintiff to be terminated on or about February 5, 2020.


**COUNT ONE**
**SEXUAL DISCRIMINATION**
**TITLE VII, AEP, ACRD**

68.     Plaintiff incorporates and adopts paragraphs 1 through 66 above as if fully set

forth herein.

69.     Defendants  have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex and disability, in violation of the laws of Arizona, as well as Federal laws, and as a result of discrimination, harassment, retaliation and hostile work environment created by the Defendants.

70.     Plaintiff is a female, with a disability, and as such, is a member of a class of individuals entitled to protection of the laws of Arizona and the United States of America.

71.     Defendants  have engaged in unlawful discrimination and unlawful employment practices including, but not limited to:

    a. Treating Plaintiff less favorably than similarly situated male employees without a disability, in the terms and conditions of their employment, including, but not limited to, refusing to provide Plaintiff with the rights of her employment, as well as creating a hostile work environment, all of which were necessary to perform her job functions while similarly situated  employees were not equally mistreated; and

    b. Creating a hostile work environment because of Plaintiff's perceived disability,  which was severe or pervasive to an extent that it substantially altered the terms and conditions of her employment.

72.     On information and belief, Plaintiff's sex was  the sole or motivating factor in Defendants' treatment of Plaintiff, and but for Plaintiff's sex, and refusal to engage in inappropriate sexual behavior, Defendants would not have engaged in discriminatory conduct toward Plaintiff.

73.     As a direct result of the hostile work environment, Plaintiff has suffered mental

and emotional distress, pain and suffering, anger, depression, anxiety, humiliation and embarrassment.

74.     By virtue of one, more, or all of the foregoing violations of pertinent laws protecting individuals, entitling Plaintiff to damages, including, but not limited to, all seniority, benefits, front and back pay, and other related harms.

75.     By virtue of one, or all of the foregoing violations as alleged above, Plaintiff has been damaged and suffered economic harm in the form of, but not limited to, lost wages and benefits, out-of-pocket expenses and monetary loss as well as non-economic damages all of which she is entitled to recover from Defendants plus pre-judgment interest, attorneys' fees and costs.

76.     The actions of Defendants and Plaintiff's supervisors and managerial employees were done in reckless indifference to Plaintiff's federally and state protected rights, and Plaintiff is therefore entitled to recover punitive damages and exemplary damages.

77.     Plaintiff has retained the Finson Law Firm Law to represent her in this litigation and has agreed to pay a reasonable fee for the services rendered in the prosecution of this action on his behalf.

## COUNT TWO
## DISABILITY  DISCRIMINATION
## ADA, AEP, ACRD.

78.     The allegations set forth above are re-alleged and incorporated herein by reference except where to do so would be inconsistent with pleading a cause of action for Disability Discrimination.

79.     At all times herein mentioned, Defendants were aware Plaintiff was perceived as being disabled, i.e, autism, a disability recognized by Defendants as one which may not subject an employee to discrimination, harassment, retaliation or hostile work

environment.

80.     Plaintiff, a disabled individual, has been subjected to adverse employment actions by Defendants because of her perceived mental condition.

81.     Said acts and conduct of Defendants, as have been more fully set forth above, have been on the basis of Plaintiff's disability, or on account of the fact that Plaintiff was regarded as disabled, or on account of the fact that Plaintiff has a record of a disability.

82.     At no time did Defendants engage in any interactive process to accommodate Plaintiff's disabilities.

83.     The unlawful employment practices on the part of Defendants and each of them, were a substantial factor in causing damages and injuries to Plaintiff as set forth herein.

84.   Plaintiff was required by statute to file a claim with the EEOC, and Plaintiff filed such a claim in a timely fashion and a right to sue letter,  was issued, thus fulfilling Plaintiff's obligation to exhaust administrative remedies.

85.     As a result of the aforesaid unlawful acts of said Defendants , and each of them, Plaintiff has lost, and will continue to lose, income and benefits in an amount to be proven at time of trial.  Plaintiff claims such amount as damages, together with prejudgment interest.

86.     As a result of the aforesaid unlawful acts of said Defendants, and each of them, Plaintiff was personally humiliated and has become mentally upset, distressed, and intimidated.

87.     Plaintiff claims general damages for such mental distress and aggravation in an amount to be proven at time of trial.

88.     As a further result of the said acts of said Defendants, and each of them, Plaintiff may be required to employ medical practitioners and physicians to examine, treat, and care for Plaintiff and may incur future medical and incidental expenses, which will be shown according to proof.


## COUNT THREE
## HARASSMENT BASED UPON SEX AND DISABILITY DISCRIMINATION
## ADA, ADEA, ACRD, FMLA

89.     The allegations set forth above are re-alleged and incorporated herein by reference except where to do so would be inconsistent with pleading a cause of action for discrimination.

90.     During the period of Plaintiff's employment with Defendants, as alleged above, Defendants  violated this Plaintiff's right to be free of discrimination based upon sex and disability.

91.     As alleged above, Defendants engaged in a concerted pattern of harassment of a repeated, routine or a generalized nature.

92.    Such harassment based on disability and sex were sufficiently severe or pervasive to alter the conditions of the Plaintiff's employment and create a hostile working environment.

93.    As alleged above, Defendants engaged in a concerted pattern of harassment of a repeated, routine or a generalized nature, thus creating a hostile working environment.


**COUNT FOUR**
**RETALIATION BASED UPON AGE AND DISABILITY DISCRIMINATION**
**ADA, ADEA, ACRD, FMLA**


94.    The allegations set forth above are re-alleged and incorporated herein by reference except where to do so would be inconsistent with pleading a cause of action for Retaliation.

95.    At all times herein mentioned the above-mentioned laws against discrimination, were in full force and effect and was binding on Defendants and DOES 1-10.  This section requires Defendants and each of them, to refrain from retaliating against an employee for having engaged in activities, or being a female or disabled, that are protected as set forth above.

96.    Said retaliatory acts and conduct by Defendants toward Plaintiff did not consist of normal business or personnel management decisions that were necessary to the job performance of Defendant's officers, supervisors or managers, or to the performance

of an officer's, a manager's or a supervisor's job.

97.     Plaintiff alleges that the aforesaid acts and conduct of Defendants toward Plaintiff constituted significant, adverse employment actions, which were in retaliation for and were motivated by Plaintiff's having engaged in the protected activities, damaging her as set forth.



       WHEREFORE, Plaintiff seeks judgment against Defendants and DOES 1-10, and each of them, on all Causes of Action, for:

1.     All medical expenses, actual, consequential, and incidental losses including but not limited to loss of income and benefits, according to proof, together with prejudgment interest, pursuant to the laws of both California and Arizona;

2.     General damages for emotional distress and mental suffering in a sum according to proof;

3.     Attorneys' fees, pursuant to the laws of Arizona and the United States of America;

4.     Costs of suit; and

**5.**     Such other and further relief as the Court may deem proper.


DATED: January 25, 2022          ***/s/ Lowell W. Finson***
                                 LOWELL FINSON
                                 *Attorney for Plaintiff*

**COMPLAINT FOR DAMAGES**

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury as to all claims so triable.

Respectfully,

DATED:     January 25, 2022          ***/s/ Lowell W. Finson***
LOWELL FINSON
*Attorney for Plaintiff*